JAMES KIRBY HAMILTON, EXECUTOR OF THE ESTATE OF DARREN KEITH HAMILTON, DECEASED v. THE TRAVELERS INDEMNITY COMPANY, A STOCK INSURANCE COMPANY

No. 8529SC149

(Filed 15 October 1985)

1. **Insurance § 69.2— uninsured motorist coverage—applicable to underinsured motorist**

    Where plaintiff's automobile policy defined an uninsured vehicle as one lacking coverage "in at least the amounts specified in [G.S. 20-279.5(c)]," the minimum liability coverage for bodily injury or death required by the statute at the time plaintiff's policy became effective was $25,000, a motorist who struck and killed an insured under plaintiff's policy had liability coverage of only $15,000, and plaintiff's policy provided uninsured motorist's coverage of $25,000, the underinsured motorist's automobile was an "uninsured automobile" within the meaning of plaintiff's policy. However, defendant insurer was entitled to an offset for amounts already received by plaintiff for insured's death.

2. **Insurance § 69— uninsured motorist coverage—stacking of separate coverages prohibited by policy**

    A provision in plaintiff's automobile insurance policy that the "limit of bodily injury liability stated in the declarations as applicable to 'each person' is the limit of the company's liability for all damages . . . because of body injury sustained by one person as the result of any one accident" prevented the stacking or aggregating of uninsured motorist coverages on three separate automobiles covered by plaintiff's policy.

APPEAL by plaintiff from *Lewis (John B., Jr.), Judge.* Judgment entered 11 December 1984 in Superior Court, HENDERSON County. Heard in the Court of Appeals 19 September 1985.

This case involves construction of uninsured motorist (UM) liability coverages.

Roberts and Lawrence were racing in their automobiles when Roberts' car struck and killed plaintiff's intestate, plaintiff's son. Lawrence's insurer paid plaintiff its policy limit of $25,000.

Roberts' insurance policy, issued before 1 January 1980, provided only $15,000 coverage, which the insurer duly paid to plaintiff. Plaintiff had liability insurance with defendant Travelers, with his intestate as an insured, issued after 1 January 1980, with three separate "coverage letters" for various family vehicles. Each coverage letter included separate UM coverage, with a separate premium, and an applicable liability limit of $25,000. Plaintiff sued defendant Travelers, alleging that Roberts' car was an uninsured vehicle within the meaning of plaintiff's policy and that defendant was separately liable under each UM coverage for a total liability of $75,000. From summary judgment for defendant, plaintiff appeals.

*Toms & Bazzle, by James H. Toms and Ervin W. Bazzle, for plaintiff-appellant.*

*Roberts, Cogburn, McClure & Williams, by Isaac N. Northup, Jr., for defendant-appellee.*

EAGLES, Judge.

[1] Plaintiff claims only under the UM coverage; no other liability is asserted under the policy. The parties do not dispute the facts, only the interpretation of the policy and applicable statutory language. Since the case presents only questions of law, summary judgment was appropriate. *Kessing v. National Mortgage Corp.*, 278 N.C. 523, 180 S.E. 2d 823 (1971). The decision of the trial court is fully reviewable here. *North Carolina Reins. Facility v. North Carolina Ins. Guaranty Ass'n*, 67 N.C. App. 359, 313 S.E. 2d 253 (1984).

Under the terms of its UM coverage, defendant obligated itself to do the following:

To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile because of:

(a) bodily injury, sickness or disease, including death resulting therefrom, hereinafter called "bodily injury," sustained by the insured;

*         *         *

"[U]ninsured automobile" means:

(a) with respect to damages for bodily injury and property damage an automobile or other vehicle with respect to the

ownership, maintenance or use of which there is, in at least the amounts specified in Subsection (c) of Section 20-279.5 of the North Carolina Motor Vehicle Safety and Financial Responsibility Act, neither (1) cash or securities on file with the North Carolina Commissioner of Motor Vehicles nor (2) a bodily injury and property damage liability bond or insurance policy, applicable to the accident with respect to any person or organization legally responsible for the use of such automobile or vehicle. . . .

The key language here is "in at least the amounts specified in Subsection (c) of Section 20-279.5 of the North Carolina Motor Vehicle Safety and Financial Responsibility Act." We note that this language parallels the statutory definition of "uninsured motor vehicle." G.S. 20-279.21(b)(3). As used here, however, it is part of a contract of insurance. Insurance contracts are construed like other contracts, but in case of ambiguity we construe them against the insurer and in favor of finding coverage. *See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 172 S.E. 2d 518 (1970) (reviewing rules of construction).

One of the settled tenets of contract construction is that the law in effect at the time of the execution of the contract becomes part of the contract. *Pike v. Wachovia Bank & Trust Co.*, 274 N.C. 1, 161 S.E. 2d 453 (1968). The contract here was executed after 1 January 1980, at which time the mandatory minimum UM coverage was $25,000 per victim. The amending act which raised the minimum to $25,000 per victim provided that it would not affect policies then in effect. 1979 N.C. Sess. Laws c. 832, s. 12. However, plaintiff's policy was not "in effect" at the time of the amendment, but only became effective when executed in early 1980. At the time the contract was entered into, the language "in at least the amounts specified in [G.S. 20-279.5(c)]" meant in at least the statutory amounts as they *then* existed. The policy's coverage letters tend to indicate to the insured that this was in fact the case: they provide $25,000/$50,000 coverage for "each person" and "each accident" respectively and premiums are charged accordingly. In the policy language no exceptions for vehicles with lower coverages appear. The contract language "in at least the amounts specified in [G.S. 20-279.5(c)]" allows the construction that plaintiff had contracted for the full $25,000 UM coverage for any covered injury to insured. This is the *policy* language, not

statutory language, and we therefore adopt that construction of the contract. Roberts' automobile was an "uninsured automobile" as defined under the policy issued by Travelers.

Had defendant wished to define its UM liability limits in terms that would have allowed it to limit its liability to the lesser amount called for in Roberts' policy, it could have done so. Defendant's policy could have provided expressly that compliance with the Act was the key to determining whether a tortfeasor was an uninsured motorist and whether the policy's UM coverage was invoked. It did not do so, but elected to frame its policy in terms of the "amounts specified in" G.S. 20-279.5(c).

We believe that our decision is consistent with the legislative intent and policy underlying compulsory UM coverage. UM coverage was designed by the legislature to provide certain minimum financial protection to persons injured by financially irresponsible motorists. *Moore v. Hartford Fire Ins. Co.*, 270 N.C. 532, 155 S.E. 2d 128 (1967). The legislature decided, as a policy matter, that a certain level of UM coverage was proper, and subsequently reconsidered and increased that minimum level. In increasing the minimum, the legislature did not expressly create any exceptions or exemptions, other than that motorists' existing policies would not be affected. We doubt that the legislature could have modified existing liability contracts. U.S. Const. Art. I, Section 10 cl. 1; *Hood v. Richardson Realty, Inc.*, 211 N.C. 582, 191 S.E. 410 (1937). The only exception to this legislative policy, as we construe it, would be that motorists with existing policies including UM coverage at the pre-amendment level could not claim up to the new limits if *they* were struck by an uninsured motorist. If those insureds, before their routinely scheduled policy renewal, desired more UM coverage at the higher, post-amendment level, they could renew their policies early. In the interim, they would not be in violation of the Financial Responsibility Act because they retained their existing, lower-limit policies nor would their insurers be forced to assume additional, uncontracted for liability. *See Oksa v. American Employers Ins. Co.*, 128 F. Supp. 681 (N.D.N.Y. 1954) (insurer has no duty to conform existing policy to new statutory minimums), *aff'd*, 218 F. 2d 585 (2d Cir. 1955) (per curiam).

On the other hand, motorists like plaintiff, who contracted and paid premiums for UM coverage *after* the effective date of

the new limits, should receive coverage up to those higher limits. The legislative policy behind UM insurance laws is not to divide liability among insurers or limit insurers' liability, but to protect the motorist to the extent the statute requires protection against a specific class of tortfeasors. *See Pickering v. American Employers Ins. Co.*, 109 R.I. 143, 282 A. 2d 584 (1971). There is nothing in the legislative scheme suggesting that insured persons should have to concern themselves with the liability insurance limits of tortfeasors; in fact, the very purpose of UM coverage is to ameliorate that concern.

We are aware of authority that a tortfeasor is not an "uninsured motorist" even though, because of payments to other plaintiffs, the amount available from which to pay plaintiff's damages is less than the statutory minimum, and even though the result ironically means that the underprotected plaintiff would have been better off if injured by a totally uninsured motorist and permitted to proceed under his own UM coverage. *See Tucker v. Peerless Ins. Co., Inc.*, 41 N.C. App. 302, 254 S.E. 2d 656 (1979); *Rogers v. Tennessee Farmers Mut. Ins. Co.*, 620 S.W. 2d 476, 24 A.L.R. 4th 1 (Tenn. 1981); Annot. 24 A.L.R. 4th 13, Section 8 (1983). However, these cases, including *Tucker*, involved a tortfeasor fully insured to the required statutory coverage limit per accident *then in effect*. Those cases concern the legislatively mandated UM upper limit *per accident*, not UM coverage *per victim* as here. Where tortfeasors have been sued by single plaintiffs and there has been conflict between the current statutory minimum and the plaintiff's policy, however, courts have been more willing to find plaintiff's insurer liable at least for the difference between the tortfeasor's insurance and the statutory minimum. *Id.* section 4.

Of particular relevance is *Oleson v. Farmers Ins. Group*, 185 Mont. 164, 605 P. 2d 166 (1980). There plaintiff's UM coverage defined "uninsured motor vehicle" as one for which there was no liability insurance "in at least the amount specified by" the state's financial responsibility law. The court drew a distinction between the terms "specify" and "require," ruling that "specify" meant "to name in a specific manner" or "state precisely." *Id.* at 167-68, *following Aleksich v. Industrial Accident Fund*, 116 Mont. 127, 151 P. 2d 1016 (1944). The statutes under consideration set two different limits. In addition to resolving the conflict in statutory

language in favor of plaintiff, the court held that the ambiguity should also be resolved in plaintiff's favor based on general principles of insurance contract law. In holding that the higher coverage limit applied, the Montana court reviewed numerous decisions and observed that where minimum limits conflict, courts typically choose the higher limits.

For the reasons stated, we hold that Roberts' vehicle was an "uninsured automobile" within the meaning of plaintiff's insurance policy with defendant. Under the policy, defendant agreed to provide UM coverage up to $25,000 for this accident. However, other policy language states that "Any amount payable to an insured under [the UM coverage] shall be reduced by . . . all sums paid to such insured . . . by or on behalf of a person legally liable therefor. . . ." Plaintiff admits that defendant is entitled to offset amounts already received. Plaintiff has already received more than $25,000 from Roberts' and Lawrence's insurers, and therefore has ostensibly lost his rights under the policy.

[2] Notwithstanding this policy provision, plaintiff argues that each of the three coverage letters provides separate UM coverage paid for by separate premiums, and that these, construed separately, should be considered in the aggregate or "stacked" to yield a total coverage of $75,000. Understandably "stacking" of UM coverage has caused some controversy. *See* 8C J. Appleman & J. Appleman, Insurance Law & Practice, Sections 5106-8 (1981). Apparently stacking or aggregating coverages may occur under North Carolina's UM scheme. In *Moore v. Hartford Fire Ins. Co., supra*, the Supreme Court suggested that an insured was not limited to the statutory amount if his other loss was greater than the statutory amount and more than one policy covered the accident. *Compare Turner v. Nationwide Mut. Ins. Co.*, 11 N.C. App. 699, 182 S.E. 2d 6 (applying *Moore*), *cert. denied*, 279 N.C. 397, 183 S.E. 2d 247 (1971). In *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 246 S.E. 2d 773 (1978), the court held that policy provisions which require that the terms of the policy should "apply separately" to separate automobiles insured under a single policy would allow stacking of medical payments coverages except where there was unambiguous language establishing that the per accident limitation applied regardless of the number of automobiles insured under the policy or other unambiguous language tying the cover-

ages to specific automobiles. *See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., supra* (coverages tied to specific cars, no stacking). It appears then that if stacking is allowed by the policy's terms, the law of North Carolina would permit it.

This policy, no doubt reflecting the "unambiguous language" requirement of *Woods, supra,* contains the following language relevant to UM coverage:

> The limit of bodily injury liability stated in the declarations as applicable to "each person" is *the limit of the company's liability for all damages,* including damages for care or loss of services, because of bodily injury sustained *by one person as the result of any one accident. . . .* (Emphasis added.)

The above provision, contained in the single policy issued to plaintiff, applied to all three coverages. Under *Woods, supra,* it operates to prevent stacking of the separate coverages. Even though it does not contain specific words from *Woods* such as "regardless of the number of automobiles insured under the policy," the effect is clearly the same. Therefore, we hold that under this policy plaintiff cannot aggregate or stack UM coverages.

Accordingly, the limit of defendant's liability here was $25,000. Plaintiff has received more than that amount, and admits defendant's right to offset. We therefore conclude that the trial court ruled correctly in granting summary judgment for defendant. The judgment appealed from is

Affirmed.

Judges JOHNSON and PARKER concur.